# EXHIBIT F-3

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re **NORTEL** NETWORKS CORP. SECURITIES LITIGATION
**No. 01 Civ. 1855(RMB).**

Sept. 8, 2003.

Investor, on behalf of putative class, brought securities fraud action against corporation and its officers. Investor moved for class certification. The District Court, Berman, J., held that: (1) investor satisfied prerequisites to class certification; (2) common questions of law or fact predominated; (3) class action was superior method of adjudicating controversy; and (4) court had subject matter jurisdiction over foreign investors for purposes of class certification.

Motion granted.

West Headnotes

[1] **Federal Civil Procedure** 187
170Ak187 Most Cited Cases
Investor seeking class certification in securities fraud action satisfied numerosity prerequisite, inasmuch as class likely numbered in the hundreds or thousands. Securities Exchange Act of 1934, § § 10(b), 20(a), as amended, 15 U.S.C.A. § § 78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

[2] **Federal Civil Procedure** 187
170Ak187 Most Cited Cases
Securities fraud case satisfied commonality prerequisite to class certification, given existence of such common legal and factual issues as whether defendants violated federal securities laws through acts and conduct alleged and whether corporation issued false and misleading statements during class period. Securities Exchange Act of 1934, § § 10(b), 20(a), as amended, 15 U.S.C.A. § § 78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

[3] **Federal Civil Procedure** 187
170Ak187 Most Cited Cases
Investor seeking class certification in securities fraud action satisfied typicality prerequisite to certification, despite contention that investor's use of indexed trading strategy did not involve reliance on integrity of market and would give rise to atypical defenses, given that reliance was clearly alleged and jury could conclude that pursuing index strategy entailed reliance. Securities Exchange Act of 1934, § § 10(b), 20(a), as amended, 15 U.S.C.A. § § 78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

[4] **Federal Civil Procedure** 187
170Ak187 Most Cited Cases
Investor satisfied prerequisite to class certification addressing adequacy of representation in securities fraud action, in that investor's claims appeared to be in harmony with those of other members of proposed class, investor took several significant "hands on" steps to prosecute case, and its counsel was qualified to pursue securities fraud litigation. Securities Exchange Act of 1934, § § 10(b), 20(a), as amended, 15 U.S.C.A. § § 78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

[5] **Federal Civil Procedure** 187
170Ak187 Most Cited Cases
Common questions of law or fact predominated in securities fraud action, supporting investor's motion for class certification, notwithstanding defendants' contention that investor was not entitled to rely on fraud-on-the-market theory of reliance because market was not efficiently driven by fundamental value. Securities Exchange Act of 1934, § § 10(b), 20(a), as amended, 15 U.S.C.A. § § 78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

[6] **Federal Civil Procedure** 187
170Ak187 Most Cited Cases
Class action was superior method of resolving securities fraud litigation, supporting class certification, given that claims likely would be numerous but would, in many instances, be too small to pursue individually, and that multiple lawsuits would be inefficient. Securities Exchange Act of 1934, § § 10(b), 20(a), as amended, 15 U.S.C.A. § §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[7] Federal Civil Procedure 187**
170Ak187 Most Cited Cases
For purposes of class certification in securities fraud action, district court had subject matter jurisdiction over claims of foreign buyers who acquired corporation's stock on foreign exchange, given allegations that, during class period, corporation and its officers extended vendor financing to United States customers which they knew to be uncreditworthy so as to artificially inflate corporation's revenues, and thus engaged in substantial fraudulent activity in United States directly causing losses to foreign investors, and given court's ability to shape class more precisely to fit issues of case as they emerged during litigation. Securities Exchange Act of 1934, § § 10(b), 20(a), as amended, 15 U.S.C.A. § § 78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

DECISION AND ORDER ON CLASS CERTIFICATION

BERMAN, J.

*1 THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS

I. Background

In this action filed on March 2, 2001, the Trustees of the Ontario Public Employees' Union Pension Trust Fund ("OPTrust"), on behalf of a putative class, allege that Nortel Networks Corporation ("Nortel"), John Andrew Roth, Nortel's Chief Executive Officer and President during the Class Period, Clarence Chandran, Nortel's Chief Operating Officer during the Class Period, and Frank Dunn, Nortel's Chief Financial Officer during the Class Period (collectively, "Defendants") violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) by, among other things, "knowingly or recklessly issu[ing] a stream of materially false and misleading representations to the investing public." (Second Consolidated and Amended Class Action Complaint ("Complaint") ¶ 3, at 2.) [FN1]

FN1. For a more detailed recitation of the facts, see this Court's Order resolving Defendants' motion to dismiss the Complaint against Nortel, reported at 238 F.Supp.2d 613 (S.D.N.Y.2003).

OPTrust moves to certify a class "consisting of all persons and entities who, during the period October 24, 2000 and continuing through and including February 15, 2001, purchased Nortel common stock or call options or sold Nortel put options, and who suffered damages thereby, including, but not limited to, those persons who traded in Nortel Securities on the New York Stock Exchange and/or the Toronto Stock Exchange." (Mem. of Law in Supp. of Lead Pl.'s Motion for Class Certification ("Pl.Br.") at 7.) OPTrust argues that "this action meets all of the requirements of Rule 23 of the Federal Rules of Civil Procedure for the maintenance of a class action" (Pl. Br. at 2) and, among other things, that all members of the class relied upon Defendants' allegedly "deceptive and materially false and misleading statements to the investing public." (Compl. ¶ 198, at 84; *see id.* ¶ 203, at 86 ("Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, traded in Nortel Securities at prices artificially inflated or distorted by defendants' wrongful conduct.") Defendants oppose class certification, arguing that (1) OPTrust is atypical because it is subject to unique defenses; (2) OPTrust is an inadequate representative because it has ceded control of the litigation to its lawyers; (3) common questions of law or fact do not predominate "because plaintiffs cannot rely upon the fraud-on-the-market theory of reliance." (Def. Mem. of Law in Opp'n to Lead Pl.'s Motion for Class Certification ("Def.Br.") at 1-12); and (4) the Court does not have subject matter jurisdiction over foreign purchasers of Nortel Securities. For the reasons set forth below, the Court grants Plaintiff's motion for class certification and appoints OPTrust as Class representative.

II. Standard of Review

*2 To succeed on a motion to certify a class, plaintiffs first must satisfy the prerequisites listed in Rule 23(a) of the Federal Rules of Civil Procedure: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a); *In re AMF Bowling Sec. Litig.*, 99 Civ. 3023, 2002

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

WL 461513, at *3 (S.D.N.Y. Mar.26, 2002). "Second, plaintiffs must show that the putative class falls within one of the three categories set forth in Rule 23(b)." *Id.* [FN2]

FN2. Plaintiffs seek certification under Rule 23(b)(3), which requires that the Court find "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

"[T]he Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation and has explicitly noted its preference for class certification in securities cases." *Maywalt v. Parker & Parsley Petroleum Co.,* 147 F.R.D. 51, 54 (S.D.N.Y.1993); *see In re Blech Sec. Litig.,* 187 F.R.D. 97, 102 (S.D.N.Y.1999) ("Class action treatment of related claims is particularly appropriate when plaintiffs seek redress for violations of the securities laws....").

"Although a court must conduct a rigorous inquiry in determining whether the requirements of Rule 23 have been satisfied, it must accept plaintiffs' allegations as true and refrain from conducting an examination of the merits when determining the propriety of class certification." *In re AMF,* 2002 WL 461513, at *3 (citations omitted); *see Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999); *Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978).

III. Analysis

The Court has reviewed, among other things, Pl. Br., dated March 21, 2003; Def. Br., dated May 30, 2003, which attaches the (expert) reports of Professor Paul A. Gompers and Professor Christopher M. James; "Lead Plaintiff's Reply Memorandum of Law in Further Support of its Motion for Class Certification," dated August 1, 2003 ("Pl.Reply"), which attaches the (expert) reports of Professor Anthony Saunders, Blaine F. Nye, Ph.D., and Professor Sanjai Bhagat; and the Complaint, dated January 18, 2002. The Court heard oral argument on September 3, 2003.

A. *Fed.R.Civ.P. 23(a)(1)--Numerosity*

[1] According to OPTrust, approximately 3,006,967,918 shares of Nortel were outstanding during the class period. (Pl. Br. at 7; *see* Compl. ¶ 39, at 15.) OPTrust estimates that "there are, at a minimum, thousands of members of the Class who purchased Nortel common stock during the Class Period." (Compl. ¶ 39, at 15.) Defendants do not dispute that the proposed class is sufficiently numerous and that joinder would be impractical. (*Accord* Def. Br.) Indeed, the class likely will number in the hundreds or thousands. *See Maywalt,* 147 F.R.D. at 55; *see also In re Frontier Ins. Group, Inc. Sec. Litig.,* 172 F.R.D. 31, 40 (E.D.N.Y.1997) (" 'In securities fraud actions brought against publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.' " (citation omitted)); *Dietrich v. Bauer,* 192 F.R.D. 119, 123 (S.D.N.Y.2000).

B. *Fed.R.Civ.P. 23(a)(2)--Commonality*

*3 [2] OPTrust asserts that common legal and factual issues here include, among others, "whether defendants violated the federal securities laws by the acts and conduct alleged" and "whether Nortel issued false and misleading statements during the Class Period." (Pl. Br. at 10.) Defendants do not dispute commonality. (*Accord* Def. Br.) "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147, 155 (2d Cir.2001) (citation omitted). "The commonality requirement of Rule 23(a)(2) has been applied permissively by courts in the context of securities fraud litigation." *In re Blech,* 187 F.R.D. at 104; *see also In re Frontier,* 172 F.R.D. at 40.

C. *Fed.R.Civ.P. 23(a)(3)--Typicality*

[3] OPTrust's claims, as well as those of the other members of the proposed class, arise out of alleged misrepresentations by Defendants concerning Nortel. (*See* Pl. Br. at 10-11.) OPTrust argues, among other things, that its "use of an indexed trading strategy [does not] give[ ] rise to atypical defenses" because "indexed trading typifies its reliance on the integrity of the market." (Pl. Reply at 5.) Moreover, OPTrust alleges specifically that it relied on Defendants' alleged misrepresentations. (*See, e.g.,* Compl. ¶ 203, at 86 ("Lead Plaintiff ... relying on the materially false and misleading statements described herein, ... traded in Nortel Securities ...." (emphasis added))); *see also In re Avon Sec. Litig.,* 91 Civ. 2287, 1998

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

WL 834366, at *5 (S.D.N.Y. Nov.30, 1998) ("Decisions regarding class certification are to be based on the allegations set forth in the complaint, which are accepted as true."). FN3

FN3. In addition, OPTrust argues that "[c]ourts have repeatedly held that additional purchases after the price of the security drops as a result of corrective disclosure do *not* give rise to atypical defenses." (Pl. Reply at 5-6 (citing cases)); *see, e.g., In re Frontier,* 172 F.R.D. at 42 (concluding that a plaintiff's purchase of defendant's stock after the disclosure of alleged misrepresentations "has no bearing on whether or not she relied on the integrity of the market during the class period" and did not defeat typicality).

Defendants dispute OPTrust's claim that it satisfies the typicality requirement because " 'class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation ." ' (Def. Br. at 12-13 (citing, among other opinions, *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990)).) Defendants argue that, unlike the putative class described in the Complaint, OPTrust "did not rely on the 'integrity' of Nortel's stock price" when OPTrust purchased Nortel stock. (Def. Br. at 13 ("[OPTrust's] trading strategy ran directly counter to market sentiment because its investment advisors concluded that the stock was highly 'overvalued' and indeed saw the emergence of a 'bubble' far earlier than the rest of the market. Yet, OPTrust bought Nortel stock largely because it was tracking an index, not because it was lulled into believing that Nortel was trading at 'a fair market price." ').) FN4

FN4. Defendants also argue that OPTrust's purchase of Nortel stock "well after the alleged 'fraud' was 'exposed" ' militates against typicality. (*Id.* at 16.)

"[T]he claims of the class representatives [must] be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." ' *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997) (per curiam). Because, among other things, "reliance" is clearly alleged, (*see, e.g.,* Compl. ¶ 203, at 86), and because a jury may conclude that pursuing an index strategy entails reliance (*see* Pl. Reply at 5 ("Indexed trading is the ultimate acknowledgment that the market is efficient because it cannot be beat.")), OPTrust satisfies the typicality requirement. *See In re Blech,* 187 F.R.D. at 106 ("[T]he typicality requirement is satisfied because, as set forth in the Complaint, the Plaintiffs' claims of fraud arise from the same course of conduct.").

*4 Moreover, "[t]he rule barring certification of plaintiffs subject to unique defenses is not 'rigidly applied in this Circuit." *In re Frontier,* 172 F.R.D. at 41; *see also In re Gaming Lottery Sec. Litig.,* 58 F.Supp.2d 62, 72 (S.D.N.Y.1999) ("Because a person is ineligible to represent a class of securities purchasers only if he 'clearly did not rely upon either the misleading financials *or* on the integrity of the market price or information, [Plaintiff] remains qualified to serve as a class representative." (citation omitted)); *see also In re Indep. Energy Holdings PLC Sec. Litig.,* 210 F.R.D. 476, 481 (S.D.N.Y.2002) (While the extent of any non-reliance on [plaintiff's] part will certainly be a fact question to be decided at trial, it is unlikely to significantly shift the focus of the litigation to the detriment of the absent class members.").

D. *Fed.R.Civ.P. 23(a)(4)--Adequate Representative*

[4] Defendants argue that OPTrust is "a wholly inadequate class representative, for it is a reluctant party that has ceded control over the litigation to lawyers." (Def. Br. at 17.) OPTrust responds that its "interests are not antagonistic to those of the Class" and that the "interests of the Class will be protected and advanced by OPTrust because its claims and interests are coextensive with those of the absent Class members." (Pl. Br. at 12.) In addition, OPTrust asserts that it has been "zealously representing the interests of the proposed Class by, among other things, retaining experienced counsel and devoting substantial time and effort to the prosecution of this case." (*Id.*) "Representatives of OPTrust met with senior attorneys from Milberg Weiss on three separate occasions to discuss the substantive allegations, the procedural posture of the litigation, the responsibilities of a class representative and OPTrust's potential interest in stepping into a lead role." (Pl. Reply at 7.) "Independent from the lawyers, OPTrust's Board of Trustees formed a Nortel Class Action Subcommittee ... to 'monitor developments, develop overall strategic direction and report to the Board in respect to the class action lawsuit" and "[a]t a Special Board of Trustees meeting on December 18, 2001--with the advice and assistance of an independent consultant--the Board

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

passed a resolution confirming its desire to seek the role of Lead Plaintiff." (*Id.; see also id.* at 8 n. 14 ("[W]e have a number of responsibilities, one of them being to manage the litigation ... [and] we have set up a subcommittee to do that." (quoting the deposition testimony of OPTrust's Chief Investment Officer, Morgan Eastman)).)

Under Fed.R.Civ.P. 23(a)(4), "adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interests of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir.2000). OPTrust satisfies the adequacy requirement. Its claims appear to be in harmony with those of the other members of the proposed class; it has taken several significant "hands on" steps to prosecute this case; and its counsel, Milberg Weiss Bershad Hynes & Lerach LLP, is clearly qualified to pursue this sort of litigation. *See also* id. at 61.

E. *Fed.R.Civ.P. 23(b)(3)*

*Predominance of Common Questions of Law or Fact*

*5 [5] Defendants argue in their brief that "because plaintiffs cannot rely upon the fraud-on-the-market theory of reliance" common questions of law or fact do not predominate over individual questions. (Def. Br. at 1); *see also* *Crommer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 130 n. 21 (S.D.N.Y.2001) (citing *In re Towers Fin. Corp. Noteholders Litig.*, 93 Civ. 0810, 1995 WL 571888, at *21 (S.D.N.Y. Sept.20, 1995), which states: "The [fraud-on-the-market theory] 'presumes that the market is a 'transmission belt which efficiently translates all information concerning a security into a price. In other words, it presumes the operation of an efficient market." ')). Defendants argue that "[t]he market was not efficiently driven by fundamental value, and that is the death knell to application of the fraud-on-the-market theory." (Def. Br. at 12; *see id.* at 2 ("Without resort to the presumption, a class cannot be certified since individual claims of reliance would have to be proven and would overwhelm the common issues.").) Defendants urge the Court, preliminarily and by a separate proceeding, to "determine whether the plaintiffs are entitled to rely on the [fraud-on-the-market] presumption for purposes of class certification," (*id.* at 4 & n. 3 ("The availability of the fraud-on-the-market presumption is a legal issue that must be resolved by the Court for purposes of deciding class certification.")) citing several cases (from other Circuits) for this proposition. *Cammer v. Bloom*, 711 F.Supp. 1264, 1290 (D.N.J.1989), *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 677 (7th Cir.2001), and *O'Neil v. Appel*, 165 F.R.D. 479, 496-505 (W.D.Mich.1996). [FN5]

FN5. Defendants submitted a letter to the Court, dated August 12, 2003, seeking to postpone a decision on OPTrust's motion for class certification so that the parties may conduct more "[e]xpert discovery followed by a possible hearing" on these issues. OPTrust responded with a letter to the Court, dated August 19, 2003, arguing "[t]he Court can and should decide the motion on the basis of the admittedly 'substantial' record already before it." The Court agrees with OPTrust on this issue. That is, the parties' thoughtful and comprehensive briefs on the motion to certify the class, which included submission of expert reports from Defendants and OPTrust, and helpful oral argument, have afforded the parties a full opportunity to address all salient points and authorities. *See* *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Baffa*, 222 F.3d at 58 ("[A] motion for class certification is not 'an occasion for examination of the merits of the case.... 'Nothing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." ' (citations omitted)). And, Defendants themselves have acknowledged that the existing class certification record is substantial as recently as July 29, 2003. (July 29, 2003 Tr. at 2 ("We have submitted a detailed brief, two expert reports, and I anticipate the plaintiffs will be doing the same. It's a pretty substantial record.").)

OPTrust contends that "it enjoys the benefit of the fraud on the market evidentiary rule, pursuant to which, in a Rule 10b-5 action against a public company such as Nortel, whose shares are traded in an open, well-developed market, it is presumed that (a) the alleged misrepresentations, so long as they are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

material, will inflate the value of the Company's shares and (b) plaintiff and all members of the Class relied upon the integrity of the market for those shares" and that "reliance is a common issue in this action." (Pl. Br. at 14.) OPTrust also argues " '[w]hether or not a market for a stock is open and efficient is a question of fact' that must wait for resolution at trial." (Pl. Reply at 1 (quoting *RMED Int'l Inc. v. Sloan's Supermarkets,* 94 Civ. 5587, 2002 WL 31780188 (S.D.N.Y. Dec.11, 2002))); *see also In re Laser Arms Corp. Sec. Litig.,* 794 F.Supp. 475, 490 (S.D.N.Y.1989) ("Whether in fact Laser Arms traded in an efficient market is a question of fact. Therefore, resolution of that issue must await presentation of further proof at trial."), *aff'd,* 969 F.2d 15 (2d Cir.1992). OPTrust argues that "Defendants' attempt to transform class certification into a complicated battle of the experts is precisely what the Supreme Court sought to preclude by barring 'preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." ' (Pl. Reply at 1 (quoting *Eisen,* 417 U.S. at 177).)

*6 The parties have been afforded "substantial" opportunity to present their respective points of view. [FN6] *See In re Frontier,* 172 F.R.D. at 42 ("For the purposes of this motion [for class certification], the court assumes the market for Frontier stock is an efficient one incorporating all public information about the company."); *Crommer,* 205 F.R.D. at 133 ("While [defendant] has identified evidence and arguments it may use at trial to rebut the presumption, it remains true that it is logical and fair to presume reliance here."); *see also Baffa,* 222 F.3d at 58 ("[A] motion for class certification is not an occasion for examination of the merits of the case.... 'Nothing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." ' (citations omitted)); *In re Frontier,* 172 F.R.D. at 39 ("In evaluating a motion for class certification, the court accepts as true the substantive allegations in the complaint and does not conduct even a preliminary inquiry into the merits of the case." (citing *Eisen,* 417 U.S. at 177-78); *In re Blech,* 187 F.R.D. at 107 ("[W]hen determining whether common questions predominate courts focus on the liability issue ... and if the liability issue is common to the class, common questions are held to predominate over individual questions." (citation omitted)).

FN6. *See also supra* note 5.

*Superiority of Class Action*

[6] The Court considers the following factors in making the determination of superiority: "(A) the interest of members of the class in individually controlling the prosecution or defenses of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." Fed.R.Civ.P. 23(b)(3).

Here, a class action is superior to other alternatives. The claims likely will be numerous but, in many instances, too small to pursue individually and, even if individual plaintiffs chose to pursue the action, multiple lawsuits would be inefficient. *See In re Blech,* 187 F.R.D. at 107 ("In general, securities suits such as this easily satisfy the superiority requirement of Rule 23. Most violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible. Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be 'fair' nor an adjudication of their claims.").

F. *Subject Matter Jurisdiction over Foreign Purchasers*

*7 [7] Defendants argue that, even if the Court certifies a class in this action, the Court "should exclude foreign purchasers of Nortel stock." (Def. Br. at 20.) Citing *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985-90 (2d Cir.1975), Defendants argue that "[w]hen foreign purchasers on a foreign exchange seek to rely upon the Exchange Act, the Second Circuit has held that our securities laws should not be exported to foreign countries that are perfectly capable of policing the companies that reside within them." (Def. Br. at 21.) Defendants emphasize Nortel's connection to Canada. (*Id.* at 22 ("The essence of the fraud alleged here is that Nortel's senior management --- all based in Canada --- made a series of representations, which materially overstated the Company's earnings."; "All of the allegedly fraudulent statements were disseminated from Nortel's headquarters in Ontario. Moreover, all challenged accounting decisions likewise were made in Canada." (footnote omitted)).) Defendants also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

argue that "as a matter of international comity, accepting jurisdiction over Canadian purchasers would overlap and supplant at least three pending Canadian class actions brought on behalf of such purchasers in the courts of Canada. Moreover, issues of judicial administration would be a nightmare...." (*Id.* at 24-25.) [FN7]

FN7. Relatedly, the Court received a letter, dated August 25, 2003 from counsel for plaintiffs in a Canada-wide class action entitled *Law, et al. v. Nortel Networks Corp., et al.*, 02-CL-4605 (Ontario Superior Court of Justice), which notes that "the other two cases are, to the best of our knowledge, limited to the Provinces of British Columbia and Quebec" and that "the Canadian courts are the proper place for determining the claims of Canadian citizens who purchased Nortel shares on the Toronto Stock Exchange." (Letter to the Court from Joel P. Rochon, dated Aug. 25, 2003 at 2-3.) The Court received a letter in response, dated September 2, 2003 from counsel for OPTrust, which argues, among other things, that "there is nothing in the applicable case law, or any proposition of international law identified by defendants, that would bar the extraterritorial application of the federal securities laws in this case ... provided that the applicable Second Circuit standards are met, which they are." (Letter to the Court from Steven G. Schulman, dated Sept. 2, 2003 at 2.)

OPTrust counters that "defendants' substantial activities in the United States are much more than merely preparatory to the fraud and thus favor a finding of subject-matter jurisdiction." (Pl. Reply at 8-9.) "The vast preponderance of customers and potential customers with whom Nortel did business during the Class Period were fiber-optic cable networks and internet service providers overwhelmingly located in the U.S." and "Nortel used its artificially inflated stock to fund an aggressive growth-by-acquisition strategy, then misled investors by failing to write down the goodwill associated with its numerous U.S. acquisitions despite substantial declines in their value.... Many of these acquisitions involved properties in the U.S." (*Id.* at 9.) In addition, OPTrust argues that the mere existence of Canadian lawsuits should not persuade the Court to deny certification. (*Id.* at 9 n. 15. ("Defendants offer no information about the nature or status of these actions, and fail to mention important differences between U.S. and Canadian securities law--most notably the unavailability of the fraud-on-the-market-theory to Canadian plaintiffs. This Court should not grant defendants' request to avoid application of the securities laws to persons executing trades in Canada, given that Second Circuit standards for extending those laws to foreign investors in this case are satisfied.").)

"Since the Securities Exchange Act is silent as to its extraterritorial application, courts have developed two tests for determining the subject matter jurisdiction over foreign transactions." *Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105, 108 (S.D.N.Y.1993). "Under the 'conduct' test, a federal court has subject matter jurisdiction if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad. A federal court also has jurisdiction under the 'effects' test where illegal activity abroad causes a 'substantial effect' within the United States." *Id.* (quoting *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir.1991).

*8 Defendants activities in the United States satisfy the test for subject matter jurisdiction. Among other things, OPTrust alleges that "defendants were consummating risky vendor financing deals in an effort to boost reported 'revenues' throughout the Class Period." (Compl. ¶ 64, at 26.) According to OPTrust, Defendants were extending vendor financing to "numerous U.S. customers that defendants knew to be uncreditworthy, so as to artificially inflate the Company's revenues." (Pl. Reply at 9); *see In re Gaming Lottery Sec. Litig.*, 58 F.Supp.2d 62, 73-75 (S.D.N.Y.1999) ("Subject matter jurisdiction is thus supported by substantial fraudulent activity in the United States directly causing harm abroad, the manner in which the same fraudulent scheme allegedly straddled both sides of the border, and the degree of economic activity connecting [defendant] to the United States."). The Court also notes, in finding subject matter jurisdiction, that "it is well established that a court can certify a class while reserving the right to shape the class more precisely to fit the issues of the case as those emerge during the litigation." *Langner v. Brown*, 95 Civ.1981, 1996 WL 709757, at *4 (S.D.N.Y. Dec.10, 1996).

IV. Conclusion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For the reasons stated herein, the Court grants OPTrust's motion to certify the class.

Not Reported in F.Supp.2d, 2003 WL 22077464 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

- 2004 WL 2973931 (Trial Motion, Memorandum and Affidavit) Nortel's Memorandum of Law in Opposition to Class Plaintiffs' Application for an Order to Show Cause (Jan. 15, 2004)

- 2003 WL 23671561 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification (May. 30, 2003)

- 2003 WL 23671559 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification (Mar. 21, 2003)

- 2002 WL 32595571 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Nortel Shareholder and Jds Uniphase Shareholder Complaints (Sep. 30, 2002)

- 2002 WL 32595569 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Nortel Shareholder and JDS Uniphase Shareholder Complaints (Sep. 17, 2002)

- 2002 WL 32595570 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss the Nortel Shareholder and JDS Uniphase Shareholder Complaints (Aug. 16, 2002)

- 2002 WL 32595566 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Nortel Shareholder and JDS Uniphase Shareholder Complaints (Jul. 05, 2002)

- 2002 WL 32595557 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint (Jun. 03, 2002)

- 2002 WL 32595564 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss the Nortel Shareholder and JDS Uniphase Shareholder Complaints (Apr. 01, 2002)

- 2002 WL 32768665 (Trial Pleading) Motion and Incorporated Memorandum for Withdrawal as Attorney of Record (Mar. 18, 2002)

- 2002 WL 32595550 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Fiducie Desjardins Inc.'s Motion for Appointment of Lead Plaintiff and Lead Counsel Pursuant to Section 21D of the Securities and Exchange Act of 1934 and for Consolidation of the Actions Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure (Feb. 14, 2002)

- 2001 WL 34611498 (Trial Motion, Memorandum and Affidavit) The JDSU Investors Group's Memorandum of Law in Opposition to the Nortel Investors Group'S Motion for Appointment of Lead Plaintiffs and Lead Counsel (May. 04, 2001)

- 2001 WL 34611496 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of the Nortel Investors Group for Appointment of Lead Plaintiff and Approval of the Proposed Lead Plaintiff's Selection of Lead Counsel (Apr. 17, 2001)

- 1:01cv01855 (Docket) (Mar. 02, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| IN RE: WILLIAMS SECURITIES LITIGATION | ) | Case Nos. 02-CV-72-H(M) Lead Case |
|---|---|---|

FILED
JUL 8 2002
Phil Lombardi, Clerk
U.S. DISTRICT COURT

ORDER

This matter comes before the Court on the motions to appoint lead plaintiff and lead counsel, filed on April 1, 2002 (Docket Nos. 16, 17, 19, 20, 25, 26, 34, 35, 38, 39). The Court issued an order on June 21, 2002 (Docket No. 123) consolidating the four remaining related cases with Case No. 02-CV-72-H(M) and bifurcating the action into the following subclasses: purchasers of Williams Communications Group, Inc. ("WCG") securities and purchasers of Williams Companies, Inc. ("WMB") securities. As contemplated by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(ii) and 15 U.S.C. § 77z-1(a)(3)(B)(ii), which requires the Court to appoint the most adequate plaintiff as the lead plaintiff for the consolidated action "as soon as practicable" after the decision on the motions to consolidate is rendered, the Court will now address the motions for appointment of lead plaintiff and lead counsel.

The Court has carefully reviewed the briefs submitted by the five lead plaintiff movants, and, for the reasons set forth below, hereby orders the appointment of Alex Meruelo as the lead plaintiff for the subclass of purchasers of WCG securities and HGK Asset Management ("HGK")





as lead plaintiff for the subclass of purchasers of WMB securities. The Court further orders the appointment of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss"), Weiss & Yourman, and Morrel West Saffa Craige & Hicks Inc ("Morrel West") as counsel for the subclass of purchasers of WCG securities and Schoengold & Sporn and the Seymour Law Firm as counsel for the subclass of purchasers of WMB securities.

I

The PSLRA sets forth detailed procedures for the appointment of lead plaintiff(s) in a private class action arising under the securities laws. 15 U.S.C. § 78u-4(a).[1] Among those procedures is the requirement that the named plaintiff in the action must file notice within twenty days of filing suit to inform potential class members of their right to move to be appointed lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i). Such notice must be published "in a widely circulated national business-oriented publication or wire service." Id. Not later than sixty days after the date on which this notice is published, any member of the putative class may move the court to be appointed lead plaintiff of the class. 15 U.S.C. § 78u-4(a)(3)(A)(ii).

The PSLRA then requires the Court to appoint a lead plaintiff for the class after determining which applicant is "most capable of adequately representing the interests of the class members." 15 U.S.C. § 78u-4(a)(3)(B). In determining which applicant should be named lead plaintiff, the Court must accept the presumption that the most adequate plaintiff in any private action is the person(s) who: (1) has either filed the complaint or made a motion in response to a

[1] The PSLRA amended both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") by adding identical sections to both acts, Section 27 to the Securities Act and Section 21D to the Exchange Act. See 15 U.S.C. § 77z-1(a)(3) and 15 U.S.C. § 78u-4(a)(3). For convenience, the Court will cite only to the Exchange Act when referring to the PSLRA.

notice; (2) in the determination of the Court, has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Under the PSLRA, the Court's determination of the "most adequate plaintiff" may be rebutted only upon proof that the presumptive lead plaintiff either: (1) will not fairly and adequately protect the interests of the class; or (2) is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

## II

### A. Appointment of Lead Plaintiff for the WCG Subclass

On January 29, 2002, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(A)(i)(I), the first notice of the pendency of this class action was published in a national business-oriented wire service. See Press Release, Milberg Weiss Bershad Hynes & Lerach LLP, Milberg Weiss Announces Class Action Suit Against Williams Companies, Inc. and Williams Communications Group, Inc. (Jan. 29, 2002) (Seymour Decl. Ex. A). Within sixty days following the date of that publication, on April 1, 2002, lead plaintiff applications were submitted by the following individuals or groups, now seeking to be appointed lead plaintiff for the subclass of purchasers of WCG securities ("WCG Subclass"): Mr. Meruelo;[2] Blaine Watkins, Bruce and Kathleen Smith and Bruce Russell ("the Watkins Group"); and Market Street Securities, Inc. ("Market Street").[3]

---

[2] The lead plaintiff application of Mr. Meruelo was originally submitted on behalf of Norman H. Kirkendoll, Michael Ewing, Alex Meruelo and Melis Paronayn ("the Meruelo Group"). In its June 6, 2002 memorandum, however, the Meruelo Group stated that, in light of the bifurcation of the action into subclasses of WMB and WCG securities purchasers, the group sought to put forward only Alex Meruelo as the proposed lead plaintiff.

[3] Douglas E. Miller and Carol Moore, purchasers of WMB and WCG securities, jointly filed a motion seeking to be appointed lead plaintiff on April 1, 2002 (Docket Nos. 22 and 23). Mr. Miller and Ms. Moore have not submitted the additional briefing ordered by the Court to

Because all three lead plaintiff motions were submitted within the time period established by the PSLRA, 15 U.S.C. § 78u-4(a)(3)(A)(i)(II), all applicants have satisfied the first requirement of the statutory test for determining the presumptive "most adequate plaintiff."

The Court must next determine the person or group of persons who "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The PSLRA, however, does not specify the procedure for the Court to follow in making this determination. See In re Enron Sec. Litig., 2002 WL 530588, at *7 (S.D. Tex. 2002); see also In re Nice Sys. Sec. Litig., 188 F.R.D. 206, 217 (D. N.J. 1999). Several courts addressing this question have applied the four-factor test articulated by the district court in Lax v. First Merchs. Acceptance Corp., 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997). See, e.g., Enron, 2002 WL 530588, at *7; In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998); Nice Sys., 188 F.R.D. 206, 217 (D.N.J. 1999). The four Lax factors used to determine the largest financial interest are: (1) the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs. Lax, 1997 WL 461036, at *5. "These factors are useful because they look to relatively objective indicators, such as the number of shares purchased or sold, rather than to the ultimate question of damages." Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146 (N.D. Cal. 1999). Notably, one of the WCG Subclass movants in this case, despite the Court's request at the April 12, 2002 hearing for clear and specific information regarding loss calculations, failed to provide information stated in these terms. Accordingly, the Court has

---

support their motion, and, accordingly, the Court deems the motion to have been withdrawn. Westmonte Plaza Inc. (Docket No. 28) and Darryl Abramowitz (Docket Nos. 30 and 31) also filed lead plaintiff applications on behalf of WCG securities purchasers. Both applications, however, were formally withdrawn and, therefore, will not be addressed here.

focused its analysis on the movants' claimed losses, the only common denominator addressed by each of the WCG Subclass movants.[4]

On the basis of the losses claimed by the lead plaintiff movants, Mr. Meruelo appears to be the lead plaintiff applicant with the largest financial interest in the outcome of the litigation. The losses claimed by the respective movants are as follows:

| Lead Plaintiff Movant | Claimed Losses |
|---|---|
| Alex Meruelo | $3,905,136.80[5] |
| Market Street | $2,300,000.00 |
| The Watkins Group | $ 224,000.00 |

Market Street argues, however, that Mr. Meruelo's losses are overstated and that instead Market Street is the movant with the largest financial interest. Market Street attacks Mr. Meruelo's loss calculation on several grounds, claiming it is overstated because: (1) Mr. Meruelo made errors in his certifications and loss calculations; (2) Mr. Meruelo improperly

---

[4] The Court recognizes its obligation under the PSLRA to "determine" the plaintiff with the "largest financial interest." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) (requiring that the "most adequate plaintiff" be the person or persons that, "in the determination of the court, has the largest financial interest in the relief sought by the class") (emphasis added); see also Aronson, 79 F. Supp. 2d at 1157. The Court further recognizes, however, that the statutory scheme for the speedy resolution of the lead plaintiff question makes it undesirable for courts to prejudge damages through an extensive fact-finding process. See Aronson, 79 F. Supp. 2d at 1157. The Court has reviewed the numerous motions and supporting memoranda addressing the lead plaintiff question and generally accepts the representations of the movants as true. Based on these representations and the unnecessary delay that would be occasioned by further proceedings, Market Street's motion for oral argument (Docket No. 119) on these issues is hereby denied.

[5] See Notice of Submission of Corrected Loss Calculation and Trading Data by Alex Meruelo; Declaration of Behram V. Parekh, filed June 6, 2002, ("Corrected Loss Calculation").

included purchases after the disclosure of fraud; and (3) Mr. Meruelo improperly calculated his losses by using the average trading price of WCG during the 90-day period following the close of the class period. The Court will address each of Market Street's criticisms in turn below.[6]

First, Market Street criticizes Mr. Meruelo's certification and therefore his loss calculation, arguing that the certification listed "numerous trades in the common stock of WCG at prices outside the range at which WCG traded on those dates." Market Street then calculates the amount by which Mr. Meruelo's losses would be reduced if the Court rejected all trades listed on the certification at prices outside the range at which the stock traded on those dates, arguing that Mr. Meruelo's claimed losses should be reduced by $1,128,665.00.

On June 6, 2002, however, Mr. Meruelo submitted a Corrected Loss Calculation and actual trading data supporting his motion for appointment as lead plaintiff. The revised loss calculation was submitted to correct the following discrepancies: (1) the trading data attached to Mr. Meruelo's certification reflected settlement dates rather than trading dates for the stock; and (2) the trading data attached to Mr. Meruelo's certification included the commission charge as part of the price of the securities, rather than reflecting just the trade price of the securities. After correcting for these errors, Mr. Meruelo's losses amount to $3,905,136.80; a total more than the

---

[6] In its June 6, 2002 Response Memorandum, Market Street also argued that Mr. Meruelo's losses were overstated because the Meruelo Group and Mr. Meruelo: (1) failed to assign value to Mr. Paronyan's shares; and (2) improperly aggregated the claims of the individuals in the Meruelo Group. Because the other individual lead plaintiff applicants in the former "Meruelo Group" have withdrawn their applications in support of Mr. Meruelo, the Court need not address these arguments.

amount stated in Mr. Meruelo's original submission.[7] The Court has reviewed the revised loss calculations and supporting trading data and finds that the errors identified by Market Street (and certain other lead plaintiff movants) have been sufficiently addressed. Accordingly, the Court finds unnecessary any reduction of Mr. Meruelo's loss calculation on the basis that the trade prices stated on the certification are in error.[8]

Market Street next claims that Mr. Meruelo's losses are overstated because his certification includes purchases of WCG securities effected after the disclosure of the fraud. Market Street argues that Mr. Meruelo's purchases of 171,700 shares of WCG stock on January 29, 2002 should be excluded from his loss calculation because the WMB press release describing the contingent guarantee of WCG debt was issued at 7:31 a.m. on January 29, 2002, before the market opened for trading.

Mr. Meruelo contends, however, that the January 29 purchases were appropriately included in his loss calculation because the class period alleged in the complaints filed in this action end on and include January 29, 2002. See, e.g., Cali, et al. v. Williams Cos. Inc., et al., Compl. at ¶ 18 ("Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

---

[7] Mr. Meruelo's Corrected Loss Calculation explains that the increase in the amount of loss is due to the inadvertent exclusion from his original submission of purchases that were "settled" after the end of the class period but "transacted" within the class period.

[8] The Court finds that the corrected errors in Mr. Meruelo's certification and loss calculation do not provide a sufficient basis for denying his motion to be appointed lead plaintiff. Cf. Amended Memo. Of Law in Opp'n to the Competing Lead Plaintiff Motions and in Further Support of the Motion of Norman H. Kirkendoll, Michael Ewing, Alex Meruelo and Melis Paronyan for Consolidation, Appointment as Lead Plaintiff and For Approval and Selection of Lead and Liaison Counsel (4/19/02) ("The fact that none of the three certifications that were filed by Market Street Securities was accurate, in and of itself, provides additional grounds for denying its motion.").

otherwise acquired the securities of WMB and/or WCG between July 24, 2000 and January 29, 2002 inclusive (the 'Class Period') and who were damaged thereby") (emphasis added). Mr. Meruclo further contends that, in addition to the press release purportedly issued at 7:31 a.m., WCG issued its own press release on January 29, which may have contradicted WMB's prior statements. Mr. Meruclo argues that these conflicting press releases created confusion in the market regarding WMB and WCG's securities.

The Court finds that a determination regarding whether the shares purchased by Mr. Meruelo on January 29, 2002 occurred after the market became aware of the alleged fraud requires an extended inquiry and factual determination as to the exact moment investors were on notice of the negative information. The Court finds that such an inquiry is inappropriate and unnecessary at this stage of the litigation and, accordingly, declines to exclude Mr. Meruelo's January 29, 2002 purchases of WCG stock from Mr. Meruelo's loss calculation on that basis.

Finally, in addition to the criticisms of the trading prices stated in Mr. Meruelo's certification, Market Street also attacks the method by which Mr. Mcruelo calculates his losses. Market Street argues that Mr. Meruelo's loss calculation, based on the PSLRA'S 90-day average trading price, 15 U.S.C. § 78u-4(e), is an inappropriate measure of loss at the lead plaintiff appointment stage.[9] Instead, Market Street argues that the appropriate measure of loss would be one based on the closing price for WCG common stock on January 29, 2002, the day the alleged fraud was disclosed. Market Street further argues that Mr. Meruelo's use of the 90-day average

---

[9] The PSLRA provides a limit on the amount of damages that can be recovered in a private action where the plaintiff seeks to establish damages by reference to the market price of a security. 15 U.S.C. § 78u-4(e)(1). That limit is calculated by determining "the mean trading price of [the] security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." Id.

trading price is an attempt to claim "more than $1,700,000 worth of losses that occurred well after the disclosure of the fraud and the end of the class period."

Market Street cites the district court's decision in In re Ribozyme Pharms., Inc. Sec. Litig., 192 F.R.D. 656, 661 (D. Colo. 2000), to support its position that the 90-day average trading price should not be used to determine the lead plaintiff with the largest financial interest in the litigation. In Ribozyme, the court found that the loss calculation for the so-called "retention" plaintiffs was the value to which the stock price fell at the end of the class period; the court also explicitly rejected the use of the 90-day average trading price as a method for calculating damages:

> The "Lead Plaintiffs" Group argues against this novel valuation method and states that it is error to read the PSLRA's "90-day bounce back" provision regarding the calculation of damages into the lead plaintiff provision regarding the largest financial interest. I agree that the determination of financial interest does not equate to damages. Damages is a term of art and a technical matter to be established by experts. The lead plaintiff provision in the PSLRA does not use the term "damages" but instead, "largest financial interest."

192 F.R.D. at 661.

The Court does not consider Ribozyme's analysis persuasive in light of the number of district courts relying upon the 90-day average trading price in comparing claimed losses. See, e.g., In re Microstrategy Inc. Sec. Litig., 110 F. Supp. 2d 427 (E.D. Va. 2000) (using 90-day period after the close of the class period to determine largest financial interest); Steiner v. Nat'l Auto Credit, 1998 U.S. Dist. LEXIS 21804, at *12 (N.D. Ohio July 16, 1998) (using the "mean trading price," or the average of the daily trading price of the security "during the 90 day period," to determine the largest financial interest in the case).[10] In fact, the Court is unaware of any other

---

[10] The Ribozyme court stated that it relied on several non-published opinions in its district that have employed the "retention value" method for determining the largest financial interest pursuant to the PSLRA. See Ribozyme, 192 F.R.D. at 660 (citing In re New Era Networks, Inc. Sec. Litig., Civil Action No. 99-WM-473 (Colo. 1999); In re Samsonite Corp. Sec. Litig., Civil Action No. 98-K-1878 (Colo. 1998); In re Boston Chicken Sec. Litig., Civil

opinion holding that the "retention value" method is the only appropriate method of calculating damages.[11]

Moreover, the Court finds that Market Street failed to follow the directive at the April 12, 2002 hearing to articulate with clarity and specificity the bases and methods for calculating its own losses. Market Street's original certification and loss calculation, unlike those of other lead plaintiff movants, failed to provide sufficient information for the Court to analyze the basis for its claimed financial interest. Furthermore, despite its sharp criticism of other lead plaintiff movants' calculations, Market Street has not provided any additional information to supplement its original submission in the four rounds of briefing following its April 1, 2002 motion.

In accordance with the PSLRA, the Court finds that Mr. Meruelo is the WCG Subclass lead plaintiff movant with the "largest financial interest" in the outcome of the litigation. The Court's determination is based on the following findings: (1) Mr. Meruelo's loss calculations have survived scrutiny and are permissibly calculated using the 90-day average trading price under the PSLRA; (2) the Watkins Group's claimed losses are significantly less than those of Mr. Meruelo; and (3) the claimed losses of Market Street are also significantly less than those of Mr. Meruelo.

---

Action No. 97-WM-1308 (Colo. 1997); In re New Era of Networks, Inc. Sec. Litig., Civil Action No. 99-WM-1274 (Colo. 1999)). The Court finds that each of these four opinions is inapposite because none of them endorses the "retention value" method or even mentions how the largest financial interest was determined. See id. Furthermore, two of the cases, New Era, Civil Action No. 99-WM-473; and Samsonite, Civil Action No. 98-K-1878, involved unopposed motions for the appointment of lead plaintiff, thereby explaining the absence of any discussion regarding the appropriate method for determining which movant had the "largest financial interest."

[11] The Court finds Market Street's attacks on Mr. Meruelo's use of the 90-day average trading price notable given Market Street's failure to make the argument before final briefs were submitted on June 6, 2002. This failure is particularly perplexing in light of the number of lead plaintiff movants calculating "losses" and financial interest using that method.

Having determined that Mr. Meruelo has the largest financial interest in the outcome of the litigation, the Court turns to whether Mr. Meruelo satisfies the requirements of Fed. R. of Civ. P. 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Many courts agree, however, that a "wide-ranging analysis under Rule 23 is not appropriate and should be left for consideration of a motion for class certification. This inquiry, therefore, focuses on the qualities of the class representatives enumerated in Rule 23(a)(3) and 23(a)(4)." Lax, 1997 WL 461036, at *6 (internal quotations omitted); see also Microstrategy, 110 F. Supp. 2d 427; Aronson, 79 F. Supp. 2d at 1158 (citations omitted) (holding that, at the lead plaintiff appointment stage, "all that is required is a 'preliminary showing' that the lead plaintiff's claims are typical and adequate.").

Market Street claims Mr. Meruelo's losses are not typical of those of the WCG Subclass under Rule 23(a) because Mr. Meruelo is subject to unique defenses as a result of his purchases of securities after the alleged disclosure of the fraud on January 29, 2002. In support of this position, Market Street quotes a brief purportedly filed by Mr. Meruelo's counsel, Milberg Weiss, on behalf of another client in an unrelated case. Market Street argues that Mr. Meruelo's purchases of WCG securities on January 29, 2002 are similar to the purchases of the lead plaintiff movant in Enron where the court determined the movant was subject to unique defenses and therefore was atypical because it purchased millions of shares of Enron stock after the disclosure of the fraud. Enron, 2002 WL 530588, at *22; see also Berwecky v. Bear, Stearns & Co., Inc., 197 F.R.D. 65 (S.D.N.Y. 2000) (holding that a person who increases his holding after

revelation of the fraud is subject to unique defenses that preclude him from serving as class representative); Kreindler v. Sambo's Rest., Inc., 1985 U.S. Dist. Lexis 23388 (S.D.N.Y. 1985) (same).

Mr. Meruelo contends that his purchases of WCG securities on January 29, 2002, the last day of the class period, can be distinguished from those of the lead plaintiff movant in Enron, the Florida State Board of Administration ("FSBA"). Mr. Meruelo explains that the FSBA's purchases of Enron securities were made on its behalf by its investment advisor, Alliance Capital Management Holding, well after the first Enron shareholder suits were filed against Enron and after the announcement of the SEC investigation into Enron.

Under Fed. R. Civ. P. 23(a)(3), the claims of the representative parties must be typical of those of the putative class. Typicality is achieved where the named plaintiff's claims arise "from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." Enron, 2002 WL 530588, at *8 (citations omitted). Even though the typicality requirement is not satisfied when the "plaintiff's factual or legal stance is not characteristic of that of other members," id., at *13 (citations omitted), the existence of minor distinctions will not preclude the typicality requirement from being met, Olsten, 3 F. Supp. 2d at 296; see also Nice Sys., 188 F.R.D. at 217; Enron, 2002 WL 530588, at *13.

The Court finds that Mr. Meruelo's purchases of WCG stock on January 29, 2002, the first day the alleged fraud was disclosed, may be distinguished from the purchases of FSBA because the purchases of FSBA occurred "after the initial public disclosure regarding [its] overstatement of its assets and partnership liabilities, after the first suits in this consolidated action were filed, and after the SEC announced that it was investigating [the company]." Enron, 2002 WL 530588, at *22. In this case, the purchases upon which Market Street seeks to disqualify Mr. Meruelo occurred on January 29, 2002, the date the plaintiffs claim the first WMB

or WCG press release regarding the alleged fraud was issued. In Enron, the court found that FSBA's claims were atypical because, unlike this case, FSBA's purchases occurred so long after the first disclosure of the fraud that FSBA, unlike other investors, did not buy the stock relying upon either the market or statements by Enron or its agents.[12] The Court finds that Mr. Meruelo's purchases were not atypical so as to disqualify him from serving as lead plaintiff.

The Watkins Group, seeking to be appointed lead plaintiff on behalf of WCG bondholders, argues that its interests will not be adequately protected by Mr. Meruelo, or any other equity holder lead plaintiff. The Watkins Group objects on the following grounds: (1) WCG shareholders do not have standing to pursue claims on behalf of WCG bondholders; and (2) because the interests of WCG shareholders and WCG bondholders are divergent, the WCG bondholders will not be adequately represented by a shareholder lead plaintiff.

To the extent the Watkins Group's first argument relates to the typicality of Mr. Meruelo's claims, the Court finds that Mr. Meruelo's claims are typical because the claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members." See Lax, 1997 WL 461036, at *6 (N.D. Ill. 1997); see also Enron, 2002 WL 530588, at *13 ("When plaintiffs have alleged such a common course of conduct, courts consistently have found no bar to class certification even though members of a class may have purchased different types of securities or interests, or purchased similar securities at different times.") (internal quotations omitted). Moreover, the Court finds that, insofar as the appointment of Mr. Meruelo

---

[12] The lead plaintiff movants, here, dispute whether the market, and Mr. Meruelo, had notice of the alleged fraud when the securities were purchased. As the Court explained above, an extended inquiry and factual determination into the exact moment investors were on notice is inappropriate and unnecessary at this stage of the litigation and will not be taken up here.

as WCG Subclass lead plaintiff presents standing issues, those issues can be resolved by the filing of an amended complaint.

The Watkins Group's second attack goes to the adequacy of Mr. Meruelo, or any shareholder lead plaintiff movant, to represent the interests of WCG bondholders. The Watkins Group, stressing the significance of the WCG bankruptcy, claims that it should also be appointed lead plaintiff in order to "ensure that the interests of bond purchasers are adequately represented and protected during any settlement negotiations, and particularly during any allocation of funds in the event of recovery." Watkins Group Reply Mem. (Jun. 6, 2002), at 4.

Under Fed. R. Civ. P. 23(a)(4), class representatives must adequately represent the interests of the putative class. This requirement is satisfied where: "(1) class counsel is qualified, experienced and generally able to conduct the litigation; (2) the class members do not have interests that are antagonistic to one another; and (3) the class has sufficient interest in the outcome of the case to ensure vigorous adequacy." Olsten, 3 F. Supp. 2d at 296 (citations and internal quotations omitted); see also Microstrategy, 110 F. Supp. 2d at 435-36. In other words, "[a]dequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action." Nice Sys., 188 F.R.D. at 219.

The Court finds that Mr. Meruelo's representation meets the Rule 23(a)(4) standard for adequacy. First, the Court finds Milberg Weiss, Weiss & Yourman, and Morrel West, the counsel selected by Mr. Meruelo, to be qualified and experienced lawyers who are unquestionably capable of conducting the litigation on behalf of the WCG Subclass. Second, the Court finds that any problems due to alleged conflicts of interest between WCG's debt and equity holders amounts to mere speculation at the present time. At this stage of the litigation, the

holders of both types of securities have the common goal of establishing the omissions and misrepresentations allegedly made to the market. See generally Enron, 2002 WL 530588, at *13. The Court further finds that the inevitable dilution of control stemming from the appointment of multiple lead plaintiffs may result in an unnecessary and undesirable weakening of the bargaining power of the WCG Subclass. See Nice Sys., 188 F.R.D. at 220 ("Representation by a disparate group of plaintiffs, each seeking only the protection of its own interests, could well hamper the force and focus of the litigation.") (internal quotations omitted). Finally, the Watkins Group's contention that Mr. Meruelo, or another shareholder lead plaintiff, will not vigorously pursue the claims of the bondholder class members is unsubstantiated. The Court finds that Mr. Meruelo's own financial stake in the litigation provides an adequate incentive for him to vigorously prosecute the action on all fronts. See generally Nice Sys., 188 F.R.D. at 219.

The final issue with respect to the appointment of Mr. Meruelo as lead plaintiff is whether any lead plaintiff movant has successfully rebutted the presumption that Mr. Meruelo is the "most adequate plaintiff." Under the PSLRA, the presumptive lead plaintiff may only be rebutted upon proof that the plaintiff either: (1) will not fairly and adequately protect the interests of the class; or (2) is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Both Market Street's and the Watkins Group's arguments for the disqualification of Mr. Meruelo on the grounds that his claims are atypical or inadequate under Rule 23(a) may be construed as rebuttal challenges under the PSLRA. See id. The Court addressed and rejected these arguments above. Therefore, the Court finds that the presumption that Mr. Meruelo is the "most adequate plaintiff" for the subclass has not been rebutted. Accordingly, the Court hereby appoints Mr. Meruelo as the lead plaintiff for the WCG subclass.

B. Appointment of Counsel for the WCG Subclass

The Court now turns to the approval of lead counsel for the WCG Subclass. As noted above, the Court finds that Mr. Meruelo's selections, Milberg Weiss, Weiss & Yourman, and Morrel West, are qualified, experienced counsel who will adequately represent the interests of the class. Accordingly, the Court approves Mr. Meruelo's selection of Milberg Weiss and Weiss & Yourman as co-lead counsel, provided there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorney fees and expenses. See Lax, 1997 WL 461036, at *7 (noting the use of co-lead counsel should not result in increased attorneys' fees and expenses). The Court also approves Mr. Meruelo's selection of Tulsa law firm Morrel West as local counsel for the WCG Subclass.

III

A. Appointment of Lead Plaintiff for the WMB Subclass

On April 1, 2002, motions seeking lead plaintiff status were filed by HGK and Teamsters Local 710 Pension Fund and Health & Welfare Fund ("Local 710"); both movants now seek to be appointed lead plaintiff for the subclass of purchasers of WMB securities ("WMB Subclass"). HGK and Local 710 submitted motions, as required by the PSLRA, within sixty days from the January 29, 2002 publication of the notice of the pendency of this class action. See 15 U.S.C. § 78u-4(a)(A)(i)(II). The potential lead plaintiffs for the WMB Subclass, therefore, both satisfy the first requirement for becoming the presumptive "most adequate plaintiff."

The Court must next determine which movant "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The financial interest claimed by the two lead plaintiff movants for the WMB Subclass are as follows:

| Lead Plaintiff Movant | Claimed Losses |
|---|---|
| HGK | $3,774,142.00 |
| Local 710 | $ 146,166.00[13] |

As previously discussed, determining which lead plaintiff movant has the largest financial interest in the litigation is, generally, the most significant inquiry for the Court in appointing a lead plaintiff. See, e.g., Aronson, 79 F. Supp. 2d at 1157. In the case of the WMB Subclass, however, HGK's alleged losses dwarf those of Local 710, and Local 710 has failed to demonstrate that HGK's claimed WMB holdings or losses are erroneously calculated or otherwise overstated. Accordingly, the Court finds that HGK has the "largest financial interest in the outcome of the litigation." See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

Local 710 argues that it should be appointed a separate lead plaintiff for a subclass of WMB bondholders.[14] Asserting similar justifications as those argued by the Watkins Group, Local 710 contends that no shareholder lead plaintiff movant has the standing required to pursue claims on behalf of the bondholders, and that Local 710's interests will not be adequately represented by a shareholder lead plaintiff.[15]

---

[13] HGK's losses were suffered in connection with its purchase of shares of WMB common stock and were determined after deducting gains from the sale of its WCG shares received as dividends; Local 710's losses were suffered in connection of its purchases of WMB notes.

[14] In its memoranda addressing the appointment of lead plaintiff, Local 710 urges the Court to appoint it lead plaintiff of a separate subclass of purchasers of WMB notes. The Court denied Local 710's request for the creation of a separate subclass in its June 21, 2002 order (Docket No. 123), and will not address that issue again here.

[15] It is unclear whether Local 710's attack is based on the grounds of typicality and adequacy under Rule 23 or an attack on HGK as the presumptive lead plaintiff.

As noted above, in determining the most adequate plaintiff, the Court must address Rule 23(a)'s typicality and adequacy requirements. The Court finds that HGK's representation meets the Rule 23(a) standards for typicality and adequacy. First, the Court finds that HGK's claims are typical of the WMB bondholders because the claims asserted by HGK on behalf of the shareholder plaintiffs "arise from the same event or practice or course of conduct that gives rise to the claims of other class members." See Lax, 1997 WL 461036, at *6. As discussed above, the Court finds that, to the extent the appointment of HGK as WMB Subclass lead plaintiff presents standing issues, those issues can also be resolved at the appropriate time by the filing of an amended complaint. Second, the Court finds that HGK's representation of the class is adequate for the reasons identified previously with respect to appointment of a lead plaintiff for the WCG Subclass because HGK: (1) has selected qualified and experienced counsel; (2) does not have any present conflicts of interest with the WMB bondholders; and (3) will vigorously prosecute the action.

Accordingly, because HGK (1) filed its lead plaintiff application within 60 days of the notice of the pendency of the action; (2) has been determined by the Court to have the largest financial interest in the litigation's outcome; and (3) satisfies the requirements of Rule 23, HGK is presumed to be the "most adequate" plaintiff. The Court finds that Local 710 has not successfully rebutted this presumption or otherwise shown that HGK cannot or will not adequately represent the class. Accordingly, the Court hereby appoints HGK as the lead plaintiff for the WMB Subclass.

B. Appointment of Counsel for the WMB Subclass

The Court now turns to the approval of lead counsel for the WMB Subclass. The Court finds that HGK's selections, Schoengold & Sporn and the Seymour Law Firm, are qualified,

experienced counsel who will adequately represent the interests of the class. Accordingly, the Court hereby approves HGK's selection of Schoengold & Sporn and the Tulsa law firm, the Seymour Law Firm, as co-lead counsel for the subclass of purchasers of WMB securities, provided there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorney fees and expenses. See Lax, 1997 WL 461036, at *7.

IV

On March 15, 2002, the parties filed a Joint Stipulation and Proposed Scheduling Order to govern the timing of submissions following the entry of the Court's order appointing lead plaintiff and lead counsel. Pursuant to this Order, and in accordance with that Joint Stipulation, the Court hereby orders the following:

1. Lead Plaintiffs for the WCG and WMB Subclasses shall file consolidated amended complaints on behalf of their respective subclasses incorporating all causes of action on behalf of all putative subclass members no later than 45 days from this order;
2. Defendants shall have 45 days from service of the consolidated amended complaints to file responsive pleadings;
3. Lead Plaintiffs shall have 45 days to file any oppositions to the responsive pleadings; and
4. Defendants shall have 15 days to reply to Plaintiffs' opposition.

IT IS SO ORDERED.

This 8TH day of July, 2002.

Sven Erik Holmes
United States District Judge